UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :     Chapter 11

BWP GAS, LLC                             :
                                               Bankruptcy No. 05-18754bif
          Debtors                        :

..................................................

MEMORANDUM OPINION

..................................................

GHK Company, LLC ("GHK") has filed a motion to dismiss this chapter 11 bankruptcy case, pursuant to 11 U.S.C. § 1112(b), alleging that it was filed in bad faith as it serves no valid bankruptcy purpose; rather, the debtor sought to obtain a perceived tactical advantage in pending litigation. GHK further asserts that the debtor cannot effectuate a plan of reorganization and has failed to fulfill various obligations as a debtor in possession.[1] The debtor contends that its chapter 11 petition was filed in good faith,

---

[1]GHK seeks dismissal of the main bankruptcy case as well as a related adversary proceeding, docketed at No. 05-0480. By order dated December 2, 2005, I abstained from exercising jurisdiction over the adversary proceeding and transferred it to state court: the District Court of Oklahoma County. That decision is currently under appeal; therefore I am without jurisdiction to dismiss that proceeding. See In re Bialac, 694 F.2d 625 (9th Cir. 1982); In re Mazzocone, 1995 WL 113110, at *4 (E.D. Pa. 1995); In re Southold Development Corp., 129 B.R. 18 (E.D.N.Y. 1991); Matter of Eddis, 37 B.R. 217, 217 (E.D. Pa. 1984).

Once an appeal has been taken, the lower court (including a bankruptcy court) loses its subject matter jurisdiction (or power) to grant relief which would alter or directly affect the order on appeal. See, e.g., Main Line Federal Sav. and Loan Ass'n v. Tri-Kell, Inc., 721 F.2d 904, 906-07 (3d Cir. 1983); In re Wallace's Bookstores, Inc., 330 B.R. 193 (Bankr. E.D. Ky. 2005). This loss of jurisdiction prevents the lower court from acting even with the consent of all parties. See Thompson v. Harry C. Erb, Inc., 240 F.2d 452, 454 (3d Cir. 1957).

Although the pendency of this appeal deprives me of the power to dismiss the adversary proceeding, it does not restrict my jurisdiction to determine GHK's motion to dismiss the bankruptcy case under section 1112. A bankruptcy court retains jurisdiction over disputes not affected by the issues on appeal. See, e.g., In re Legend Radio Group, Inc., 248 B.R. 281,

(continued...)

and that it has complied with the numerous fiduciary requirements of a debtor in possession. Therefore it opposes dismissal.[2]

This motion is the latest in a series of tactical maneuvers between the debtor and GHK arising from investment agreements made in 2003 involving exploratory oil and gas wells located in Oklahoma.  At bottom, the debtor prefers to have the adjudication of its claims arising from those agreements take place in a federal court such as this, while GHK prefers adjudication of all disputes under those agreements to occur in Oklahoma state court.

I.

I held an evidentiary hearing on GHK's dismissal motion, and the following facts were proven.

BWP Gas, LLC, the debtor, is a limited liability company that was established solely to invest in oil and gas interests with GHK in 2003.  N.T. at 90; Ex. 3 at 9-10; Ex. L at 6.  It has no assets (other than a modest bank account approximating $9,250, see Exs. B and I), but for its alleged interests in certain oil and gas wells, the

---

[1](...continued)
284 (W.D. Va. 1999);  In re Hardy, 30 B.R. 109, 111 (Bankr. S.D. Ohio 1983).  Whether this chapter 11 case was filed in good faith under section 1112 is an issue distinct from whether this court was correct in abstaining from deciding an adversary proceeding.  Moreover, a bankruptcy court may dismiss a bankruptcy case yet, in appropriate circumstances, retain jurisdiction over a pending adversary proceeding.  See In re Smith, 866 F.2d 576 (3d Cir. 1989).

[2]The debtor has also filed a proposed disclosure statement for which it seeks approval, and to which GHK has objected.  Given the resolution of the motion to dismiss, I need not resolve that contest.

rights to which are in litigation to be described below.  Ex. B.  Those interests were

valued on the debtor's bankruptcy schedules as worth $1.6 million.  Ex. B.[3]

BWP as a limited liability company has only two membership interests.

One such interest is held by Oklahoma Hills Gas, LLC for 1%, while CSOR Preferred

Liquidation, LLC ("CSOR") holds the second interest for 99%.  Ex. 6.  Mr. Ernest

Bartlett is the managing member of BWP; he lives and works in Little Rock, Arkansas.

Ex. 3 at 5-6.

The majority owner of the debtor, CSOR, is in turn owned by 11 entities all

with connections to Mr. Bartlett, Mr. Howard M. Appel or Mr. Stephen Harrington.  See

Ex. 14.  For example, Mr. Appel is president of 1025 Investments, Inc., Ex. 4 at 46, which

owns 18.61% of CSOR; Mr. Bartlett is the president of FEQ Investments, Inc. (owned by

GWR Trust, a trust for the benefit of Mr. Bartlett's children), which is the managing

member of and owns 34.51% of CSOR, Ex. 4 at 70;[4] and Mr. Harrington is president of

SPH Investments, Inc., Ex. 4 at 75, a 24.19% member of CSOR.[5]

BWP considers its principal place of business to be an office suite located

in Bala Cynwyd, Pennsylvania.  N.T. at 116-17.  These offices play host to approximately

25 entities.  In many of those entities, Mr. Appel is an officer, director, or managing

---

[3]Without explanation, Mr. Appel testified at the hearing that the interests were
worth $2.5 million.  N.T. at 122.

[4]He is also the president of HBA Gas, which is the manager of Oklahoma Hills
Gas, LLC, the 1% owner of BWP.

[5]He is also president and managing member of Continental Southern Resources,
Inc. (n/k/a Endeavor International Corp.), Ex. P (6/12/03 letter attached to proof of claim).
See Corporate Resolution of Members of BWP Gas, LLC (docketed at #2) and N.T. at 68-69.

member.  N.T. at 65-67.[6]  On the outside door of this suite of offices is the name "HMA Advisors."  N.T. at 65.

BWP has no employees; rather it pays consultants to provide needed services, such as legal and accounting services.  N.T. at 118-19.  At least some of these consultants are located in Philadelphia, Pennsylvania, including the Bala Cynwyd suite. Id.  Further, BWP has no rent or utility expenses.  Ex. 3 at 74-75.

In February 2003, May 2003 and June 6, 2003, BWP, GHK LLC and GHK/Potato Hills Limited Partnership ("GHK LP") entered into a series of agreements that would purportedly provide the debtor with a small (5% to 8.5%) working interest in certain oil and gas wells—referred to as Mary #2-24, Lippincott #1-21; Shirley #1-20; and Indian #1-27— at a cost of more than $6 million, plus stock in Endeavour International Corp.  See Ex. O; Ex. N.  The Mary well was the subject of the first two agreements.  The three additional wells were the subject of the June 2003 contract.

BWP asserts that it paid $2.5 million of the sum owed in connection with the Mary well in April 2003, and failed to pay the balance solely due to misrepresentations and fraud committed by GHK and an entity known as North American Natural Gas, Inc. ("NANG"), as well as individuals connected to those entities.  Ex. N.  It further avers that GHK breached the June 2003 agreement involving the other three wells by failing to provide required reports and distributions.  Id., at 14 ¶ 46.

BWP received dividends from its interest in one or more of these additional wells totaling $27,305 in 2003, and $37,484 in 2004.  See Ex. B (Statement of Financial

---

[6]For example, 1025 Investments, 1025 Partners, CSOR Preferred Liquidation, LLC, IL Resources and SPH Investments have offices at the same address.  N.T. 66, 68, 69.

Affairs, #1).  In May 2003, GHK notified BWP that the latter no longer held an interest in the Mary well and forfeited the $2.5 million paid.  Ex. N at 7, ¶ 20.  This led to the May 19, 2003 agreement, whereby BWP sought to restore its interest in that well.  Id. at 7-8, ¶¶ 23-24.  It is unclear whether BWP believes that it presently holds an interest in the Mary well, as it never paid the consideration promised in the May 2003 exploration agreement.  However, it does not consider any interest in the Mary well as valuable.  Id. at 8, ¶ 26.

On April 5, 2005, GHK sent a letter to BWP announcing it to be in default of its contracts and declaring that GHK no longer "consider[s] BWP to own any interests in or rights attributable" to these [Shirley and Lippincott] wells.  Ex. 5.  In addition, in that letter GHK asserted "a right to an offset under Oklahoma law to all sums previously tendered by BWP" involving the Shirley and Lippincott wells and revenues associated with the Indian (f/k/a Turley) well.  Id.  BWP construes this letter as GHK's attempt to terminate its interests in all three additional wells.  Ex. N. at 14, ¶ 47.[7]

---

[7]Since BWP contends that this letter was the impetus for its bankruptcy filing, the complete text of the body of the letter is worth noting:

Re: Exploration Agreement . . . dated June 6, 2003 . . .

Section 8.1 of the Agreement described above provides that, for BWP Gas L.L.C. and its successors and/or assigns (together "BWP") to properly elect to participate and earn any interest in any "Subsequent Well", as therein defined, BWP must pay its proportionate share of the costs relating thereto.  Despite continued billings, collection letters and attempts to orally communicate with BWP, BWP has failed to pay $143,009.83 for costs associated with the Shirley #1-20 Well, and $61,852.12 for costs associated with the Lippencott [sic] #1-21 Well, each of which are Subsequent Wells under the Agreement.  GHK therefore declares that BWP failed to fully elect to participate in these wells and that GHK does

(continued...)

Before this default letter was sent, lawsuits between these parties had begun

involving the Mary well and the February and May 2003 exploration contracts.[8]  In March

2004, GHK LLC, GHK LP and Mr. Brian Egolf commenced a civil action in Oklahoma

state court against BWP, Endeavour and HBA Gas, Inc.[9]  The complaint (styled a

"verified petition") alleged that the defendants had failed to transfer the Endeavour stock

as required by the May 2003 agreement.

In April 2004, BWP and HBA removed this litigation to the District Court

for the Western District of Oklahoma.  In their subsequent answer to the complaint, they

included two counterclaims alleging fraudulent and negligent misrepresentation in

connection with the two Mary well exploration agreements, for which they sought

---

[7](...continued)
not consider BWP to own any interest therein or rights attributable
thereto.

In addition, despite the efforts described above, BWP has failed to
pay $62,837.07 in costs associated with the "Initial Well" under the
Agreement, the Indian #1-27 Well (formerly named the "Turley
#1-18").

GHK hereby notifies you that GHK declares a right to an offset
under Oklahoma law to all sums previously tendered by BWP for
the payment of costs associated with the Shirley #1-20 and
Lippencott [sic] #1-21 Wells under the Agreement, and to all
revenues associated with the Indian #1-17 Well, against damages
alleged in the pending litigation brought by GHK, et al against
BWP, et al in Oklahoma City.

[8]A more complete description of the procedural maneuvers of the various parties
can be found in my earlier memorandum in Adv. No. 05-0480.  I shall summarize the more
salient points below.

[9]HBA Gas, Inc. is the managing member of Oklahoma Hills Gas, LLC, the 1%
member of BWP.  HBA filed bankruptcy in this court on the same day as BWP.  HBA's case,
docketed at Bankr. No. 05-18753bif, was dismissed by order dated March 8, 2006, on motion of
GHK Company, LLC and with the consent of HBA.

damages in excess of $75,000 on each count.  In October 2004, the three state-court

plaintiffs successfully had the litigation remanded back to state court based on a lack of

complete diversity of citizenship.

Once the matter returned to state court, discovery and various disputes

concerning discovery ensued.  The state court issued orders on January 12, 2005 and June

15, 2005 resolving some of these disputes.  The litigation remained in state court when

BWP and HBA filed voluntary petitions in bankruptcy under chapter 11 in the Eastern

District of Pennsylvania on June 27, 2005, and so informed the state court of their

bankruptcy filings.  The state-court plaintiffs then voluntarily dismissed without prejudice

their claims against the two debtors.[10]  As a result, there remained pending in the state

court the initial claims against Endeavour, as well as the counterclaims raised by BWP,

HBA and Endeavour.

One month after filing its bankruptcy petition, on July 26, 2005, BWP filed

an adversary proceeding in this forum and quickly thereafter an amended complaint,

naming as defendants the three original state-court plaintiffs, plus Mr. Robert S. May and

Mr. Robert Hefner, both officers of GHK.  In its amended complaint, BWP alleged facts

surrounding all three exploration agreements.  Averring fraud and misrepresentation,

BWP raised eight claims against some or all of the defendants: intentional and

constructive fraudulent transfers under state law, pursuant to 11 U.S.C. § 544; rescission

due to fraud in connection with both exploration agreements under state law; negligent

---

[10]As I remarked in an earlier memorandum, the parties in this court accept that the
state-court claims against BWP and HBA were voluntarily dismissed at the direction of the state-
court plaintiffs and without approval from the state court.  Presumably, then, Oklahoma state
procedure has no rule comparable to Fed. R. Civ. P. 41(a).

misrepresentations under state law; conversion under state law; unjust enrichment under

state law; constructive trust under state law; equitable accounting under state law; and

turnover of interests in the three additional wells under 11 U.S.C. § 542.[11]

Also that day, BWP and HBA removed their counterclaims against the three

plaintiffs from the Oklahoma state court to the Bankruptcy Court for the Western District

of Oklahoma, pursuant to 28 U.S.C. § 1452(a) and Fed. R. Bankr. P. 9027.  They then

moved to transfer venue of that proceeding to this bankruptcy court, which motion may

still be pending in that forum.

The state-court plaintiffs meanwhile filed a motion to abstain or to remand

BWP's adversary proceeding filed in this court to state court.  Finding that the better

exercise of discretion was to abstain from hearing this proceeding, by Memorandum and

Order dated December 2, 2005, I granted the plaintiffs' request, transferring the adversary

proceeding to the Oklahoma state court.  BWP has appealed this order to the District

Court of the Eastern District of Pennsylvania, which appeal is pending.

In addition, on January 30, 2006, GHK LLC and GHK LP jointly, and Mr.

Egolf, filed proofs of claim, both claiming to be owed $11.725 million.  Exs. O and P.[12]

On March 1, 2006, BWP filed an objection to those claims, as well as eleven

counterclaims.  Ex. N.  Therein, BWP averred that the GHK parties and Egolf

fraudulently induced it to enter into the first twoexploration agreements concerning the

---

[11]For reasons previously detailed in a memorandum decision involving this
adversary proceeding, I concluded that BWP was not asserting an actual turnover action under
section 542 of the Bankruptcy Code.

[12]As Mr. Egolf's proof of claim is identical to that filed by GHK, I shall assume
for purposes of this contested matter that both could not recover from BWP; therefore, I shall
treat the claim as belonging to GHK.

8

Mary well, having represented to BWP that it would earn a profit by "flipping" its interest in the Mary well by assigning it to NANG, "without expending any substantial sum of its own money." Id. at ¶ 30. They further allegedly "fraudulently represented" that the Mary well was a success and that the funds for the NANG assignment were forthcoming. Id. at ¶ 31. Rather than BWP being in breach of the agreements, the debtor contends that the first two exploration agreements are subject to rescission for fraud. Id. at ¶ 32. BWP also seeks to avoid the loss of its interests in the other three wells, contending that there was an April 5, 2005 transfer of interest that is avoidable as a preference, a fraudulent conveyance, and/or improper setoff. Id., at ¶¶ 88-102. It also seeks a declaration that it retains its interest in those three wells. Id., at ¶¶ 103-08.

      BWP's objection to the GHK proof of claim also includes counterclaims based on: Section 10(b) of the Exchange Act and SEC Rule 10b-5; Section 20(a) of the Exchange Act; fraudulent transfers under state law; fraudulent inducement/rescission; and negligent misrepresentation. Id. In sum, BWP seeks expungement of GHK's claim, rescission of the first two exploration agreements (and thus recovery of the $2.5 million paid), setting aside of the transfer of its interests in the other three wells, restoration of its interest in three wells, and damages including interest and costs.

      Therefore, at present, there is state court litigation involving BWP, HBA, Endeavour, GHK and others, with various claims and counterclaims. In addition, GHK has filed a proof of claim in this bankruptcy case, to which BWP has objected. This proof of claim and the objection thereto arise from the same transactions and raise many of the

same causes of action now pending in state court.[13]   And all of this litigation revolves

around the 2003 exploration agreements signed by BWP, payments made at that time, and

the April 5, 2005 letter.

In this bankruptcy case, the debtor listed GHK as a disputed, unsecured

creditor with a claim of $6 million on Schedule F of its bankruptcy schedules.  Ex. B.

Sixteen other unsecured creditors are scheduled in the total amount of $900,000.  Id.  Half

of the scheduled creditors are purported to have advanced loans to the debtor in the total

amount of $636,500.  Ex. 12.  The other creditors provided legal or accounting services

totaling $271,515.  Ex. 13; see also N.T. at 118-19.  No creditor besides GHK is

scheduled as holding a disputed, contingent or unliquidated claim.[14]   None of the

lender/creditors was pressuring the debtor for payment, N.T. at 106, possibly because they

all have some connection to Messrs. Appel, Bartlett or Harrington, as follows:

| | |
|---|---|
| 1025 Investments | Mr. Appel is president. (N.T. at 67, 79) |
| 1025 Partners | 1025 Investments is managing member. (N.T. at 67, 79) |
| CSOR Preferred Liquidation, LLC | 1025 Investments is managing member (N.T. at 67); CSOR owns 99% of BWP (N.T. at 68) |

---

[13]As mentioned earlier, there may also be pending in the Bankruptcy Court for the
Western District of Oklahoma a lawsuit involving the three state-court plaintiffs and Endeavour,
that was commenced in state court, removed to federal district court, remanded back to state
court, removed a second time, and then referred to the Bankruptcy Court for the Western District
of Oklahoma.  The plaintiffs dismissed their claims (without prejudice) against BWP and HBA
in this matter.

[14]Thus, by virtue of Fed. R. Bankr.  P. 3003(c)(2), these creditors need not file any
proofs of claim.  The debtor's schedules are viewed as sufficient.

| | |
|---|---|
| FEQ Investments | owned by trust for Mr. Bartlett's children (N.T. at 69) |
| Hacuser Finance S.A., Inc. | controlled by Mr. Harrington (N.T. at 79) |
| IL Resources | owned by entities controlled by Messrs. Appel and Bartlett (N.T. at 78) |
| Margas Investments | Mr. Appel owns interest through 1025 Investments (N.T. at 68); owned by companies affiliated with Appel, Bartlett and Harrington (N.T. at 78) |
| SPH Investments | Mr. Harrington is president. (N.T. at 69) |

Of the eight creditors who have no connection with those three individuals, six provided legal services related to the pre-bankruptcy litigation with GHK. Ex. 13. The two accounting services creditors were owed only $28,000. Id. No evidence was offered that any of these creditors were pressuring BWP for payment.

On December 21, 2005, the debtor filed a disclosure statement and proposed chapter 11 plan. This plan anticipates a cash infusion of $250,000 from a capital call on the entities comprising CSOR, resulting in that entity retaining its equity interest in the debtor. Ex. K (Disclosure Statement, at 10). Administrative claims and any priority tax claims would be paid in full, an amount estimated at $36,500. Id., at 9-11. BWP opines that all of its creditors, except GHK, would receive a 23.5% dividend

11

from the cash infusion of $250,000, if the debtor were unsuccessful in its litigation with

GHK.  Id., at 10.  Creditors would be paid in full if the debtor were successful.  Id., at 11.

The calculation of the 23.5% dividend does not include GHK's claim

however, as it had not yet filed a proof of claim when BWP's plan was first submitted.

Adding GHK's $11.725 million claim yields a total of unsecured claims amounting to

$12,633,015 ($11,725,000 plus $908,015).[15]  Distribution under BWP's plan in that

instance results in a nominal 1.69% dividend to unsecured creditors ($213,500 [$250,000

minus the $36,500 to administrative/priority claims] divided by $12,633,015).

Mr. Appel testified that the proposed $250,000 contribution is based on

what "we thought was sufficient as opposed to what we could raise."  N.T. at 121.

However, when asked what he thought the value of the interest in the four wells totaled,

Mr. Appel answered $2.5 million, with almost all of the value coming from the Shirley,

Turley and Lippicott wells  N.T. at 122-23.[16]  In addition, Mr. Appel explained that

BWP's lawsuits ask for in excess of $5 million from GHK, plus retention of an interest in

the oil and gas wells.  N.T. at 124-25.

The debtor proffers several reasons for filing bankruptcy.  Mr. Appel stated

at the hearing the following response:

> At that point we were in the midst of settlement conversations
> with GHK, and those had broken down and we were advised
> by counsel that based on GHK's trying to set-off our interest
> in these wells, that we had a limited window to be able to take
> advantage of protections that could be afforded under Chapter

---

[15]I assume that if GHK holds an allowed claim, then Mr. Egolf's claim is
duplicative.

[16]BWP believes its interest in the Mary well, if not terminated, to be worth less
than $100,000.  Ex. N at 8, ¶ 26.

> 11 for either fraudulent conveyance or preference claims
> against GHK for trying to take the interest that we had in the
> Shirley Well for a relatively small amount of the total
> investment that we had in the Shirley and Turley wells, and so
> that was the reason that we filed at the time.
>
> * * *
>
> At the time, there was also – we had been building up a
> significant amount of debt, and at that point with our rights
> under question with GHK and not having a clear picture of
> that, and as well having continuing obligations going forward
> to continue, to have to not only fund the projects but also the
> litigation costs, it was basically a desire on the part of the
> source of our funds that we would need to have some more
> ability to define the amount of the outstanding obligations so
> we could fund it going forward, and to be able to fix that
> amount and have a – have a legitimate plan to go forward
> with.

N.T. at 115-116.

In its post-trial memorandum, the debtor avers that "[t]he principal reason

for the Debtor's bankruptcy filing was that GHK's alleged forfeiture of the Debtor's

interest in the wells was either a voidable preference, voidable set-off and or a fraudulent

conveyance.  In order to preserve the Debtor's preference claim against GHK, the Debtor

would have to file a bankruptcy petition within 90 days of the alleged forfeiture . . . ."

Debtor's Post-Trial Memorandum, at 1-2.  BWP also observes that it has creditors other

than GHK that it has been unable to pay due to GHK's actions vis-a-vis the exploration

agreements.  See id. at 2, 13.

Clearly, BWP's reference to the 90 day preference window refers to the

April 5, 2005 letter sent by GHK, referred to above.  Ex. 5.

13

II.

On request of a party in interest, a court may dismiss a chapter 11 case or convert it to chapter 7, "whichever is in the best interest of creditors and the estate for cause[.]"  11 U.S.C. § 1112(b).  While subsection (b) provides some specific examples of circumstances in which cause may arise, those examples are not exclusive.  Implicit in section 1112(b) is the requirement that every chapter 11 bankruptcy case be filed in good faith.  See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004); In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999); see also In re Brown, 951 F.2d 564, 567 (3d Cir. 1991); Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989); In re Chisum, 847 F.2d 597, 600 (9th Cir. 1988); Argus Group 1700, Inc. v. Steinman, 206 B.R. 757 (E.D. Pa. 1997); In re SB Properties, Inc., 185 B.R. 198 (E.D. Pa. 1995). Therefore, if a petition is filed in bad faith, it may be dismissed for cause under section 1112(b).  See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d at 118;  In re SGL Carbon Corp., 200 F.3d at 162; Carolin Corp. v. Miller; In re Natural Land Corp., 825 F.2d 296 (11th Cir. 1987).

In the Third Circuit, "[o]nce at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'"  In re SGL Carbon Corp., 200 F.3d at 162 n.10.  Accordingly, once the movant meets an initial burden of production, the debtor bears the burden of persuasion on the issue of bad faith.

The Third Circuit Court of Appeals has instructed that "[a]t its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful

14

balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." In re Integrated Telecom Express, Inc., 384 F.3d at 119. Insofar as chapter 11 is concerned, the Supreme Court has noted that "the two recognized policies underlying Chapter 11, [are] preserving going concerns and maximizing property available to satisfy creditors." Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership, 526 U.S. 434, 453 (1999).

Whether any bankruptcy case is filed in bad faith depends upon the totality of the circumstances. In re SGL Carbon Corp., 200 F.3d at 162; In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996); see, e.g., Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991); In re Ravick Corp., 106 B.R. 834, 843 (Bankr. D.N.J. 1989). In the context of a chapter 11 reorganization, such a petition is not filed in good faith "unless it serves a valid reorganizational purpose." In re SGL Carbon Corp., 200 F.3d at 165. Although the totality of the circumstances approach is not constrained to any particular fact pattern, the Third Circuit has observed: "Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." In re Integrated Telecom Express, Inc., 384 F.3d at 119-20.

For example, a chapter 11 case is filed in bad faith when there is no possibility that the debtor can reorganize under chapter 11. See Carolin Corp. v. Miller; see also Matter of Love, 957 F.2d 1350 (7th Cir. 1992); Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222. In such an instance, the bankruptcy filing merely serves to

delay creditors without increasing the value of the estate or preserving any going concern. In addition, bad faith may be present when the debtor is using the bankruptcy filing "merely to obtain tactical litigation advantages." In re SGL Carbon Corp., 200 F.3d at 165; see, e.g., In re C-TC 9th Avenue Partnership, 193 B.R. 650, 654 (Bankr. N.D.N.Y. 1995) ("Where the primary purpose of the filing of a Chapter 11 case is as a litigation tactic, the petition may be dismissed for lack of good faith"). Indeed, Chief Judge Sigmund, in In re Argus Group 1700, Inc., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996), noted that a bankruptcy reorganization case may properly be dismissed as in bad faith "where the bankruptcy petition was filed as a litigation tactic, a forum shopping device and/or to resolve what is essentially a two-party dispute." See also In re Mazzocone, 200 B.R. 568, 576 (E.D. Pa. 1996) (suspension of a bankruptcy case under section 305 was warranted "if the bankruptcy forum is indeed being used as a forum to resolve what is in essence a two-party dispute.").

In other words, bad faith can arise in certain circumstances when the bankruptcy petition was filed primarily to create a bankruptcy forum for what is essentially a two-party dispute that could be resolved in a non-bankruptcy forum. See, e.g., In re SB Properties, Inc., 185 B.R. at 205; In re Fonke, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004); In re Herndon, 218 B.R. 821, 825 (Bankr. E.D. Va. 1998). Indeed, bad faith is even more likely to be found when a particular outcome of the two-party dispute is necessary for any reorganization to occur.

Thus, in In re Schlangen, 91 B.R. 834 (Bankr. N.D. Ill. 1988), the bankruptcy court dismissed a chapter 11 case for cause finding that its success depended on the outcome of the adversary proceeding the debtor had filed. The court pointed out

16

that the debtor could have brought the same claims as counterclaims in the state court

foreclosure lawsuits filed prepetition by her mortgagee.  Id. at 837.  The court further

noted that the debtor only scheduled $36,000 in unsecured debt, with one unsecured

creditor—owed $10,000 and a friend of the debtor—testifying that he did not intend to

pursue the debt in the bankruptcy proceeding,  id. at 836, and the others consisting solely

of the debtor's bankruptcy attorneys, who had not attempted to collect on their claims

either.  Id.  The court concluded that "it is clear that the litigation of that claim is the

principal activity of the Debtor and her lawyer in this case."  Id. at 838.

　　　　The Schlangen court cautioned that the debtor's use of the bankruptcy

process to confer federal jurisdiction on state law claims and invoke the automatic stay

"would not compel dismissal of the case for bad faith if the Debtor had other legitimate

purposes for her filing."  Id. at 838.  However, upon consideration of the totality of the

circumstances, the court did not find any legitimate bankruptcy purposes.  "The Debtor's

plan depends upon her success in the federal and state litigation, not any restructuring of

her business or her relationship with creditors.  The Court must find that there is no

business left to reorganize and that this Chapter 11 case cannot serve the purpose of

rehabilitating the Debtor's business."  Id.  Finally, the court noted that "[t]he Debtor's

success in [the] dispute may provide her with a fund with which to pay debts, but that

would be equally true outside Chapter 11."  Id. at 839.

　　　　Various courts, upon reviewing the fact pattern of reported decisions, have

identified the following non-exclusive indicia reflecting the possibility of bad faith:

> (1) the debtor has few or no unsecured creditors;
> (2) there has been a previous bankruptcy petition by the
> debtor or a related entity;
> (3) the prepetition conduct of the debtor has been improper;

17

(4) the petition effectively allows the debtor to evade court
orders;
(5) there are few debts to non-moving creditors;
(6) the petition was filed on the eve of foreclosure;
(7) the foreclosed property is the sole or major asset of the
debtor;
(8) the debtor has no ongoing business or employees;
(9) there is no possibility of reorganization;
(10) the debtor's income is not sufficient to operate;
(11) there was no pressure from non-moving creditors;
(12) reorganization essentially involves the resolution of a
two-party dispute;
(13) a corporate debtor was formed and received title to its
major assets immediately before the petition; and
(14) the debtor filed solely to create the automatic stay.

In re SB Properties, Inc., 185 B.R. at 205 (footnotes omitted) (quoting Mellon Bank v.

Selig (In re Selig), 1993 WL 764800, at *3 (Bankr. M.D. Pa. July 8, 1993)); see generally

In re Cornelius, 195 B.R. 831 (Bankr. N.D.N.Y. 1995).

Of course, the existence of one or more such indicia does not compel a

finding that the debtor filed its bankruptcy petition in bad faith.  Instead, a court must

consider all of the relevant circumstances surrounding the filing, giving due regard to the

congressional purposes behind chapter 11.[17]

III.

In support of its motion to dismiss, GHK likens this chapter 11 case to

Schlangen, and submits both that BWP cannot reorganize and that BWP filed bankruptcy

---

[17]For example, even if venue is proper, the bankruptcy filing in a forum primarily
intended to be inconvenient to the debtor's adversaries may be evidence of bad faith.  See In re
Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1395 (11th Cir. 1988) (debtor filed in Middle District of
Florida although property, employees, creditors and pending state court proceedings were located
in Kentucky).

only to obtain a tactical advantage in its existing litigation with the GHK parties. BWP's

bankruptcy filing in Philadelphia during the pendency of the state court litigation was, in

GHK's belief, a decision designed solely to forum-shop, as well as delay the progress of

discovery in the Oklahoma state court matter. In so contending, GHK emphasizes that

BWP has no active business and no employees; furthermore the bulk of its debts are owed

to entities that have some connection with individuals who are involved with BWP and

who loaned BWP funds. Other creditors are entities who provided prepetition services in

connection with the debtor's lawsuits with GHK. Indeed, GHK maintains that this

bankruptcy case is no more than a two-party dispute that can and should be resolved in

state court. See generally In re Gonic Realty Trust, 909 F.2d 624, 627 (1st Cir. 1990).

      BWP argues to the contrary. It underscores that it has more than $900,000

of unsecured debt, with no ability to repay its creditors at present. Moreover, it

emphasizes its preference, setoff and fraudulent conveyance claims against GHK, claims

that are only triggered by virtue of its bankruptcy filing. To dismiss this case would

eliminate, in BWP's view, such bankruptcy claims to the detriment of its creditors.

Finally, BWP maintains that the plan it has proposed could be confirmed, because GHK

cannot vote in opposition to the plan given the pending objection to its claim. See 11

U.S.C. § 1126(a); Jacksonville Airport, Inc. v. Michkeldel, Inc, 434 F.3d 729 (4th Cir.

2006).

      Thus, BWP likens these circumstances to those found in In re PPI

Enterprises (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003). In PPI, the Third Circuit affirmed a

bankruptcy court's conclusion that a chapter 11 filing by an insolvent entity for

liquidation purposes and utilization of section 502(b)(6) was undertaken in good faith, even though the debtor was not an ongoing business and had only one employee.

For the following reasons, and upon review of all of the facts surrounding this chapter 11 case, I am unpersuaded by BWP's contentions that this chapter 11 case does more than provide a forum for the litigation of claims that can and should be heard in state court. I conclude that the better exercise of discretion under section 1112(b) is to dismiss this chapter 11 case.

A.

BWP has proposed a reorganization plan under which its equity holders will retain their membership interests. There are only four classes in the proposed plan: Class A consists of administrative claimants under sections 503 entitled to a first priority of payment under section 507(a)(1); Class B consists of general unsecured claims; Class C consists of priority tax creditors; and Class D consists of equity holders. Ex. J, Article 2, at 8.

In order to confirm a plan under section 1129, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10); Matter of Greystone III Joint Venture, 995 F.2d 1274, 1277-78 (5th Cir. 1991), cert. denied, 506 U.S. 821 (1992). The provisions of section 1129(a)(10) are mandatory. See, e.g., In re Bloomingdale Partners, 170 B.R. 984, 994 (Bankr. N.D. Ill. 1994); see generally In re Dupell, 2000 WL 192972, at *3 (Bankr. E.D.

Pa. 2000).  Moreover, they are applicable here since BWP's plan impairs the unsecured

creditor class within the meaning of section 1124.  See Ex. L, at 13 (debtor's proposed

disclosure statement).

Here, there is no creditor class that is both impaired and eligible to vote,

except for Class B.  Equity holders, here Class D, are a class of interests, not a class of

claims.  See 11 U.S.C. § 1126(d).  The vote of interest holders is not considered for

purposes of section 1129(a)(10).  See In re U.S. Truck Company, Inc., 800 F.2d 581, 584

(6th Cir. 1986).  Furthermore, all holders of administrative claims, Class A, are entitled to

be paid in full on the effective date by virtue of section 1129(a)(9).  Thus, such claimants

are not entitled to vote for or against a proposed chapter 11 plan, as they cannot be

impaired.  See, e.g., In re Barakat, 99 F.3d 1520, 1528 (9th Cir. 1996).  BWP's proposed

disclosure statement so notes.  Ex. L, at 11.

Similarly, the class of priority tax claimants, Class C, cannot vote because

under the proposed plan this class is not impaired.  Ex. L, at 13.  By virtue of section

1126(f), an unimpaired class is "conclusively presumed to have accepted the plan" and

thus cannot vote.  The only creditor possibly in this class is the IRS, which has filed an

unsecured claim in the amount of $1,519.31.  Docketed as Proof of Claim #1.[18]  BWP will

simply pay this claim in full.

Accordingly, the only impaired class eligible to vote for or against any plan

proposed by BWP is the class of unsecured creditors: Class B.  See BWP's Post-Trial

Memorandum, at 8 ("The class of general unsecured creditors is the sole impaired voting

class under the Plan, and its vote in favor of the Plan is necessary for confirmation.").  In

---

[18]I note, however, that this claim does not assert any priority status.

21

order to accept the plan, more than two-thirds in amount of claims and more than one-half in number of claimants must vote in favor of the plan.  See 11 U.S.C. § 1126(c).  Were GHK's claim to be considered, GHK will oppose any plan proposed by BWP.  And given the amount of GHK's asserted claim, the remaining claimants of Class B cannot approve the plan over GHK's negative vote, and so confirmation must be denied.  See generally In re North Washington Ctr. Ltd. Partnership, 165 B.R. 805, 810 (Bankr. D. Md. 1994).

To avoid this conclusion, BWP observes that a creditor whose claim has been objected to does not hold an allowed claim within the meaning of section 502(a), and thus cannot vote under section 1126(a).  But as the Fourth Circuit recently noted, a creditor whose claim has been objected to can obtain the right to vote on a chapter 11 plan either by obtaining the temporary allowance of its claim under Fed. R. Bankr. P. 3018(a), or by fully adjudicating the objection prior to any vote.  Jacksonville Airport, Inc. v. Michkeldel, Inc, 434 F.3d at 732.

The full adjudication of BWP's objection to GHK's claim, which claim is based upon the May 2003 agreement, would afford the debtor the federal forum for its dispute with GHK that I deemed inappropriate in December 2005, when I abstained from hearing BWP's adversary proceeding.  Indeed, even a temporary allowance hearing, which is intended to be summary, see In re Zolner, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994), aff'd, 249 B.R. 287 (N.D. Ill. 2000), could be quite extensive in this instance, see id. (estimation hearing took 12 hours), as well as duplicative of matters pending in state

court.[19]  At least two different contracts are at issue, involving multiple parties and

numerous allegations.  If the counterclaim portion of BWP's objection to GHK's proof

claim also needs to be heard, the factual dispute and issues are even more extensive and

time-consuming.

It is therefore clear that the only procedure by which BWP could meet the

requirements of section 1129(a)(10) for confirmation—depriving GHK of the right to

vote more than $500,000 of its $11 million claim[20]—would necessitate holding an

extensive hearing on the validity of BWP's objection to the claim.[21]  If BWP holds an

allowed claim of $500,000 or more, confirmation must be denied and BWP cannot

reorganize.

---

[19]GHK's claim appears to be based primarily upon the contractual provisions in
the May 2003 agreement concerning the CSOR stock.   Ex. O.  Its proof of claim acknowledges a
settlement with Endeavour (CSOR's successor) that, if effectuated, would reduce the amount of
its claim to approximately $9 million.  BWP offers a number of reasons, both factual and legal,
to justify rescission of this contract.  Without "pre-judg[ing] the validity of the claim[] filed by
GHK,"  BWP's Post-Trial Memorandum, at 25, I can fairly conclude that considerable evidence
would be needed even to estimate that GHK's claim is less than $500,000.

[20]If the non-GHK unsecured claims are less than $1 million, and if GHK could
vote $500,000 or more against the plan, the two-thirds in amount requirement could never be
met.

[21]GHK maintains that BWP's plan proposal, by which BWP's members would
retain their equity interests after confirmation, violates the "absolute priority rule" found in
section 1129(b)(2)(B).  See generally Bank of America Nat. Trust and Sav. Ass'n v. 203 North
LaSalle Street Partnership, 526 U.S. 434 (1999).  In so doing, it overlooks that this plan can only
be confirmed if the unsecured creditor class votes in favor of the plan.  Such an affirmative vote
would render the provisions of section 1129(b)(2)(B) irrelevant in this instance.  See generally In
re 455 CPW Associates, 1999 WL 675972, at *4 (S.D.N.Y. 1999).

B.

Once one concludes that BWP cannot reorganize under chapter 11 without

addressing and either eliminating or greatly reducing GHK's asserted claim, at least by

estimation, and given that a similar dispute is currently pending in Oklahoma state court,

the issue of good faith becomes more focused.  Is it appropriate in these circumstances to

have the BWP versus GHK dispute heard in bankruptcy court as the essential component

of a chapter 11 reorganization rather than dismiss the case and have that dispute resolved

in state court?

This bankruptcy forum is not needed to preserve a going concern, since

BWP is not an operating entity.  Moreover, if BWP prevails in its claims against

GHK—including the recovery of its April 2003 $2.5 million payment via rescission—it

will have no need to reorganize under chapter 11, as it will be able to pay its creditors in

full outside of bankruptcy.  Conversely, if BWP loses this litigation, then no chapter 11

reorganization is possible given the size of GHK's claim.

Similarly, the bankruptcy filing cannot be viewed as protecting property

held by the debtor that would otherwise be available to satisfy creditors, as BWP has no

assets beyond its disputed interests in the oil and gas wells, and the small amount of funds

in its bank account.  As I noted in my memorandum transferring the debtor's adversary

proceeding back to state court:

> [T]he claims raised in this proceeding represent virtually all
> of BWP's assets.  The only tangible property scheduled by
> BWP, other than its alleged interest in the four oil and gas
> wells, is a bank account in the amount of $9,248.00.  This
> bankruptcy filing does not appear to have been undertaken to
> protect assets from execution, nor even to reduce the costs of

24

> litigation.  Presumably, those costs would be the same
> whichever forum determines the debtor's claims against
> GHK.

Court Memorandum of December 2, 2005, at 24 n.6.

Although this chapter 11 bankruptcy does not concern the preservation of a going concern, nor even the preservation of existing assets, BWP contends that a chapter 11 reorganization will maximize the property available to its creditors (and equity holders) by enabling it to increase its assets by certain avoidance claims, asserted as counterclaims in its objection to GHK's proof of claim.  Ex. N.  Those claims— fraudulent transfer, avoidable setoff and preference—arise under sections 547, 548 and 553 and thus, in the debtor's view, justify its bankruptcy filing and thereby demonstrate its good faith.  "The Debtor filed its petition in order to avail itself of the rights afforded debtors-in-possession under the avoidance provisions of the Bankruptcy Code and assert fraudulent conveyance, preference, and or avoidable set-off claims against GHK for the benefit of the Debtor's creditors."  BWP's Post-Trial Memorandum, at 14.[22]  It further

---

[22]GHK does note that BWP did not assert a preference claim in the adversary proceeding filed at the beginning of the case.  It was only asserted recently in its objection to GHK's proof of claim in March 2006.  Thus, GHK infers that such a claim was not considered by BWP in electing to file a voluntary bankruptcy petition.

Similarly, BWP did not disclose in its Statement of Financial Affairs, Ex. B ## 10 and 13, any transfers of property made outside the ordinary course of business within one year, nor setoffs made by a creditor within 90 days preceding commencement of the case.  This non-disclosure may support GHK's inference.

argues: "These core claims are only available to the Debtor in a Chapter 11 case and would be unavailable as a remedy under state law." Id., at 9.[23]

Thus, BWP contends that a bankruptcy filing which would increase the assets available to creditors via bankruptcy avoidance claims with distribution to occur in a liquidating chapter 11 plan is in good faith. I accept that, under certain circumstances, this is correct. See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197 (chapter 11 filing undertaken to utilize section 502(b)(6) was in good faith). But see In re Integrated Telecom Express, Inc., 384 F.3d 108 (chapter 11 filing undertaken to utilize section 502(b)(6) was in bad faith).

BWP's argument of good faith, however, is premised upon its having some possibility of success on its avoidance counterclaims. To find good faith, BWP need not in this contested matter demonstrate that its success on those counterclaims is certain. But if it is clear at this juncture that BWP's claims based upon bankruptcy law are improbable, then under the circumstances of this case—i.e., with no going concern entity; no employees; no tangible assets; similar state court litigation pending prepetition—all that this bankruptcy filing would achieve is to establish a federal forum for state law litigation. Moreover, the chapter 11 case would devolve into a two-party dispute involving state law. If BWP's state law claims against GHK are valid it need not reorganize. And if the debtor's claims are invalid, it cannot reorganize.

---

[23]Since BWP's objection to GHK's proof of claim expressly limits its bankruptcy based claims to the three non-Mary wells, its justification for filing bankruptcy implicitly acknowledges that its attempt to rescind the first two exploration agreements involves only state law: issues that can be fully resolved in the Oklahoma state court.

In those circumstances, the chapter 11 filing would not be in good faith.

See, e.g., In re Schlangen, 91 B.R. 834.  Therefore, I must analyze the viability of BWP's

bankruptcy law avoidance claims against GHK.  If prevailing on those claims is clearly

improbable, then dismissal of this case is warranted.  See In re Hatcher, 218 B.R. 441,

448-49 (B.A.P. 8th Cir. 1998) (chapter 11 case was filed in bad faith when its purpose is

to prosecute a fraudulent conveyance claim that has no chance of success), aff'd, 175

F.3d 1024 (8th Cir. 1999) (Table); see also In re McNallen, 197 B.R. 215, 220 (Bankr.

E.D. Va. 1995) (conversion from chapter 7 to chapter 11 was in bad faith where the

debtor intended to prosecute "dubious" claims).


IV.


A.


As noted in the factual recitation above, all payments made by BWP to

GHK occurred in 2003 when the oil and gas exploration agreements were executed.

BWP's bankruptcy petition was filed in June 2005.  The transfer reach-back provisions of

sections 547, 548 and 553 do not extend that far.  Thus, those statutory provisions would

not permit recovery of those payments.[24]

BWP theorizes, however, that the April 5, 2005 letter from GHK, notifying

BWP that it had forfeited its interest in the three additional oil and gas wells and

---

[24]State law fraudulent conveyance actions have a longer reach-back period.
Obviously though, an entity does not need to file a bankruptcy petition to assert such a claim.

declaring an intention to set off any sums due to BWP against any damages caused by

BWP's breach of contract somehow constitutes an avoidable transfer which arose within

90 days of its June 2005 bankruptcy filing.  See BWP's Post-Trial Memorandum, at 4-5.

Such a theory is unsupportable for these reasons.

      Both sections 547 (preference) and 548 (fraudulent conveyance) are

concerned exclusively with the avoidance of transfers.  Although the payment of money

or the assignment of an interest in property constitutes a transfer within the definition of

11 U.S.C. § 101(54) and thus potentially subject to avoidance, courts have long held that

the pre-bankruptcy contractual termination or forfeiture of an interest does not represent a

transfer that can be avoided for fraudulent conveyance or preference purposes.  "When a

termination is pursuant to the terms of a contract, there is no transfer."  Matter of Wey,

854 F.2d 196, 199 (7th Cir. 1988) (forfeiture of a deposit is not a transfer within the

meaning of a preference or fraudulent conveyance); see, e.g., In re Coast Cities Truck

Sales, Inc., 147 B.R. 674 (D.N.J. 1992) (truck manufacturer's prepetition termination of

dealership agreement does not constitute a transfer of property within meaning of section

548); In re LiTenda Mortg. Corp., 246 B.R. 185 (Bankr. D.N.J. 2000) (termination of the

debtor as a mortgage servicer is not a transfer); Matter of Jermoo's Inc., 38 B.R. 197

(Bankr. W.D. Wis. 1984) (termination by an oil company of franchise-dealership

contracts with the operator of two gasoline stations could not be set aside as fraudulent

transfer under section 548); see also In re 421 Willow Corp., 2003 WL 22318022, at *6

(E.D. Pa. 2003) ("[A] prepetition termination of a nonresidential lease cannot be avoided by the more general provisions of Sections 547 and 548.").[25]

      In this contested matter, GHK asserted in its April 5, 2005 letter that it contractually terminated BWP's interest in oil and gas wells, presumably pursuant to the June 2003 agreement.  If GHK had no contractual right to do so, those interests remained with BWP without regard to any preference and fraudulent conveyance law.  However, if GHK had the right to so act, such a forfeiture cannot be undone by sections 547 or 548. Therefore, BWP's bankruptcy filing does not expand the potential recovery of its creditors.

B.

      Similarly the debtor's setoff challenge under bankruptcy law is improbable.

      Also in April 2005, GHK declared that it had set off the monies paid by BWP—unspecified—against the unquantified damages caused by BWP's breach of contract due to non-payment.  If GHK had the state law right to offset the funds received from BWP against the damages incurred by the latter's purported breach of contract, the current bankruptcy filing would not alter that result.

---

[25]Compare In re Brown, 118 B.R. 57 (Bankr. N.D. Tex. 1990) (debtor's assignment to his spouse of an oil and gas lease and working interest in a producing oil well, in repayment of an outstanding obligation, was avoidable by trustee as preferential transfer); In re Bethel Resources, Inc., 79 B.R. 717 (Bankr. S.D. Ohio 1987) (transfer of a non-producing, working interest in an oil and gas well is avoidable).

Bankruptcy law generally upholds, although it does not create, a prepetition right of setoff.  See 11 U.S.C. § 553(a); Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.")  Non-bankruptcy law establishes a creditor's setoff rights.  Section 506(a) respects those rights by providing that a "creditor's claim is secured to the extent of the amount subject to setoff."  In re Patterson, 967 F.2d 505, 509 (11th Cir. 1992); see, e.g., In re Koch, 224 B.R. 572, 575 (Bankr. E.D. Va. 1998).  Setoff is therefore viewed as a type of "preference" permitted by bankruptcy law.  See Matter of Moses, 91 B.R. 994, 996 (Bankr. M.D. Fla. 1988).  That is, without the provisions of sections 506 and 553, any attempt to offset a mutual debt between a creditor and a debtor arguably would amount to a preference under section 547 and could, therefore, be avoided if it took place within 90 days of the bankruptcy filing.  See In re Aspen Data Graphics, Inc., 109 B.R. 677, 683 (Bankr. E.D. Pa. 1990).

As a result, if GHK possessed a valid right to setoff in April 2005, that right arose under state law; moreover, to the extent that BWP would propose a chapter 11 plan that would extinguish any valid, prepetition right of setoff that a creditor may have, such a plan may not be confirmed over creditor opposition.  See In re Continental Airlines, 134 F.3d 536, 542 (3d Cir.), cert. denied sub nom. United States v. Continental Airlines, 525 U.S. 929 (1998).

Although setoff rights are not extinguished in bankruptcy, section 553(a) specifies three instances in which a setoff may be avoidable.  See generally 1 Bankruptcy, § 6-41 at 681 (Epstein, et al. 1992).  The first, § 553(a)(1), occurs when the creditor's

claim is disallowed.  To the extent that BWP's objections to GHK's claim are based upon

state law, this particular exception would also be available in state court if GHK's claims

against BWP are invalid, as a component of damages, and thus does not arise solely

because of this bankruptcy filing.[26]  The second, § 553(a)(2), involves only setoff rights

that have been transferred to the creditor prior to the bankruptcy filing.  There is no

assertion that GHK received its claim against the debtor via assignment.  The third, §

553(a)(3), is limited to claims against the debtor that first arose within 90 days of the

bankruptcy filing and were incurred for the purpose of obtaining a setoff.  Here, GHK's

claims against BWP, if valid, arose in 2003 when the exploration agreements were

signed—well outside the 90 day reach-back period.  Moreover, such claims were not

incurred for the purpose of obtaining a setoff.[27]

      Since the application of the provisions of section 553(a) would not justify

BWP's bankruptcy filing, I now consider section 553(b).  This subsection offers a fourth

basis to avoid a prepetition preference and appears to be relied upon by BWP in its

counterclaims against GHK.  Ex. N at 21, ¶ 90 (alleging that GHK improved its position

within the 90-day reach-back period).  As I explained in Aspen, 109 B.R. at 684:

> Subsection § 553(b) states that the right of setoff will be
> limited to the extent that the creditor improved its position

---

[26]Indeed, BWP alleges that GHK has no valid claim and thus no right of setoff
under state law.  Ex. N at 21, ¶ 89.
     I also appreciate that section 502(d) disallows claims of creditors whenever the
creditor has been found to have received an avoidable transfer and does not return the transferred
property or the value thereof.  See 4 Collier on Bankruptcy, ¶502.05 (15th ed. rev. 2005).  For the
reasons just discussed, this provision will not be applicable in this bankruptcy case.

[27]"Section 553(a)(3) is most commonly applied in cases where a bank accepts or
builds up a debtor's deposits shortly before bankruptcy in order to set them off against an
unsecured or undersecured debt owed to the bank."  1 Bankruptcy, § 6-41 at 684.

during the 90 day reachback period. . . .  That is, where a
setoff occurred within 90 days before the commencement of
bankruptcy, the trustee (or, as here, the debtor in possession)
may recover the amount of setoff to the extent of a reduction
of the insufficiency within a certain time frame.

"Insufficiency" is defined at § 553(b)(2) as the amount by
which a claim against a debtor exceeds a mutual debt owing
to the debtor by the holder of such claim. Under § 553(b), the
amount to which the setoff may be recovered is determined by
comparing the insufficiency in existence 90 days before the
filing (or, if later, the first date on which there was an
insufficiency . . .) with the insufficiency on the date of setoff.
The trustee or debtor in possession is entitled to recover the
amount by which the former amount exceeds the latter. . . .
The Third Circuit Court of Appeals has noted that the
congressional concern in enacting this "improvement in
position" test was that creditors, primarily banks, that had
mutual accounts with the debtor would foresee the approach
of bankruptcy and scramble to secure a better position for
themselves by decreasing the "insufficiency," to the detriment
of the other creditors. . . . A bank with a continuing
relationship with the debtor could not only anticipate the
bankruptcy filing, but also pressure the debtor to increase its
deposits, or reduce its short-term loans to the debtor. Lee v.
Schweiker, 739 F.2d at 877.

(citations and footnote omitted); see also 1 Bankruptcy, § 6-41 at 688-89.

Accordingly, the avoidance provision of section 553(b) would only be

applicable in this bankruptcy case if, on the 90th day prior to its bankruptcy filing, BWP

and GHK owed mutual obligations to one another.  (BWP filed its bankruptcy petition on

June 27, 2005.  The 90th day prior to filing would be March 29, 2005.)  In addition,

section 553(b) would require that the obligation that BWP owed to GHK—the latter's

damage claim for breach of contract—exceed any obligation that GHK owed to BWP,

based upon funds paid in for interests in oil and gas wells.  Only if BWP owed GHK a

greater amount would there be an insufficiency.  If BWP owed GHK less there is no

32

insufficiency and section 553(b) is not applicable.  (The excess setoff would likely be recoverable, however, under state law.)

If BWP has a valid right of rescission, it is entitled to receive $2.5 million from GHK.  Such a rescission claim may exceed the value of GHK's setoff claim, thereby rendering section 553(b) inapplicable.[28]  If I accept BWP's implicit contention that there was an insufficiency, then section 553(b) would permit BWP to avoid any improvement in GHK's position that it held as a creditor on March 29, 2005.  If, however, there was no such improvement, then the setoff cannot be avoided.  Improvement is measured only by the amount that the creditor's insufficiency decreased.  See generally Durham v. SMI Industries Corp., 882 F.2d 881, 884 (4th Cir. 1989); In re Murphy, 203 B.R. 972, 976 (Bankr. S.D. Ill. 1997).

Based upon the allegations made by BWP in its objection to GHK's proof of claim, there was no such improvement of position.  GHK's setoff claim against BWP was the same on March 29, 2005, as it was seven days later on April 5, 2005, just prior to setoff.  BWP's claim against GHK was also the same on both dates.  Once setoff occurred, GHK's claim would be reduced by the amount set off with a concomitant credit in favor of BWP, but the balance still due would be the same as the insufficiency that existed one week earlier, on the 90th day.  See, e.g., In re Turner, 96 F.3d 465, 468 (10th Cir. 1996):

> Ninety days before the petition was filed the Turners owed the
> SBA $199,551.58. On the same day the United States owed

---

[28]The setoff claim, which may be based upon the June 2003 contract, may be distinct from the amount of GHK's proof of claim, apparently arising from the May 2003 agreement.  The parties' claims under the various contracts may also not be mutual.  For purposes of this analysis, I will assume mutuality.

the Turners $24,599.35 for ASCS payments.  Thus, the
insufficiency at this time was $174,952.23. According to the
Turners' argument, the first setoff occurred forty-two days
before the petition was filed in the amount of $2,788.00. After
this alleged setoff, the Turners would have owed the SBA
$196,763.58, and the ASCS would have owed the Turners
$21,811.35. Thus, after the first alleged setoff the
insufficiency would still have been $174,952.23. The Turners
further allege that setoffs occurred on two other dates within
the ninety-day prepetition period. Even were we to assume
this to be true, no improvement in position occurred. As with
the first setoff, the amount of insufficiency would not have
changed because the ASCS payments would have reduced the
amount owed to the Turners by the same amount that the debt
owed to the SBA would have been reduced. Because the
insufficiency would not have changed, the SBA could not
have improved its position.

(footnote omitted); In re Brooks Farms, 70 B.R. 368, 372 (Bankr. E.D. Wis. 1987) ("On

May 6, 1985, CCC's claim against the debtor was the same as it was on April 4, 1985.

On May 6, 1985, CCC's obligation to the debtor was the same as it was on April 4, 1985.

Because CCC's claim and obligation both remained constant over the relevant period,

there was no improvement in position. § 553(b) is therefore of no consequence.").[29]

Therefore, section 553 does not increase the claims held by BWP against

GHK.  And any legal challenge that BWP would have to GHK's prepetition setoff action

in April 2005 can be asserted in the state court forum, because it will be based upon the

parties' contractual rights.

---

[29]Unless there were some modification in the mutual obligations owing between
March 29, 2005 and April 5, 2005—which is highly unlikely given that the claims arose from
contracts entered into in 2003, and given the short time frame—the amount of the insufficiency
must remain unchanged.

34

V.


BWP's claims against GHK in this chapter 11 case constitute a dispute over

the terms of various pre-bankruptcy contracts and the alleged conduct and statements of

GHK.  Such claims arise under non-bankruptcy law, and can readily be determined by the

Oklahoma court in which the debtor already has litigation pending.  There has been no

showing in this contested matter that the debtor could not obtain complete relief in state

court, if its claims are valid.  Its bankruptcy law claims are quite unlikely to provide any

additional relief.

These state law claims thus represent the sole material assets of the debtor.

See In re Van Owen Car Wash, Inc., 82 B.R. 671, 672 (Bankr. C.D. Cal. 1988) (bad faith

filing where sole estate asset was lawsuit for breach of contract, fraud, rescission and

restitution involving state law).  Moreover, resolution of the claims by and against GHK

must occur before any reorganization could occur.  See In re AXL Industries, Inc., 127

B.R. 482, 485 (S.D. Fla. 1991) (dismissing case where nothing to administer until two-

party dispute resolved).  In addition, the convoluted procedural history of the GHK versus

BWP litigation, with some or all claims having surfaced now in four different courts,

supports dismissal as a method to reduce any forum-shopping designs.  See In re Argus

Group 1700, Inc., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996).

Considering the totality of the circumstances, I conclude that this case was

filed in bad faith, as no legitimate bankruptcy purpose is served in adjudicating in this

forum what is really a two-party dispute.  There is no business to reorganize, no

employees' jobs to save, no creditors hounding the debtor; the debtor has no payroll, rent

or utility expenses.  See Ex. 3 at 74-75.  See also In re Cinole, Inc., 339 B.R. 40, 45

(Bankr. W.D.N.Y. 2006) (no cash or working capital on filing date supported dismissal

for bad faith filing, as no business to reorganize); SB Properties, Inc. (no employees to

protect, no ongoing business, no significant creditors other than the mortgagor); In re

HBA East, Inc., 87 B.R. 248, 262 Bankr. E.D.N.Y. 1988) (few other creditors and no

evidence that any dunning for payment, no funds to run business or assets to fund plan).

There is little chance that claims arising solely from the bankruptcy filing may possibly

benefit creditors.

  Therefore, rather than the forum change being a consequence of a necessary

bankruptcy filing, this bankruptcy case was a result of BWP's desire to change forums.

BWP was created for one purpose—not just to invest in oil and gas wells—but

specifically to invest in wells with GHK.  It has no current business to reorganize nor to

liquidate.  Everything hinges on the outcome of its litigation with the GHK parties, which

will either put it back in business or finish it.  Bankruptcy jurisdiction is neither needed

nor appropriate for this dispute.  Nothing can be accomplished in chapter 11 until there

has been a determination of their disputes, which process was already in motion before

BWP came into this court.

  Given the facts presented, this chapter 11 case should be dismissed under

11 U.S.C. § 1112(b). An appropriate order to that effect shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :    Chapter 11

BWP GAS, LLC                             :
                                              Bankruptcy No. 05-18754
                    Debtors               :

...................................................

ORDER

...................................................


AND NOW, this 19th day of June 2006, for the reasons stated in the

accompanying memorandum, it is hereby ordered that GHK Company, LLC's motion to

dismiss this chapter 11 case, pursuant to 11 U.S.C. § 1112(b), is granted.


_____
BRUCE FOX
United States Bankruptcy Judge


copies to:

Allen B. Dubroff, Esq.
Jaffe, Friedman, Schuman, Nemeroff,
Applebaum & McCaffery, P.C.
7848 Old York Road, Suite 200
Elkins Park, PA 19027

Michael Blumental, Esq.
Brown Raysman Millstein
Felder & Steiner, LLP
900 Third Avenue
New York, NY 10022

Howard Gershman, Esq.
Flamm Boroff & Bacine, P.C.
794 Penllyn Pike
Blue Bell, PA 19422

Reid E. Robison, Esq.
John D. Stiner, Esq.
McAfee & Taft
Two Leadership Square
10th Floor
211 North Robinson
Oklahoma City, OK 73102

Kevin Callahan, Esq.
Office of the United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107